IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| BRETHREN MUTUAL INSURANCE COMPANY, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO.: WDQ-12-0753 |
| SEARS, ROEBUCK AND COMPANY, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Brethren Mutual Insurance Company ("Brethren") sued Sears, Roebuck and Company ("Sears") and Liberty Transportation, Inc. ("Liberty") (together, the "defendants") for negligence. ECF No. 2. Sears removed to this Court. ECF No. 1. Pending are the defendants' motion for sanctions or to reopen discovery and file a third-party complaint, ECF No. 45, and motion to dismiss or for summary judgment, ECF No. 47. No hearing is necessary. Local Rule 105.6 (D. Md. 2011). For the following reasons, discovery will be reopened, the motion for sanctions and to file a third-party complaint will be denied without prejudice, and summary judgment will be denied.

I. Background[1]

At all relevant times, Brethren insured the home of Terry Stancill ("Mr. Stancill") and his wife Regina Stancill ("Mrs. Stancill"), (together, the "Stancills").  *See* ECF No. 48-1.  On May 10, 2009, the Stancills bought a Kenmore refrigerator with a built-in icemaker from a Sears store in Bel Air, Maryland.  *See* ECF Nos. 48-2, 49-3 at 11, 49-4 at 6.  They paid an additional fee for Sears to deliver and install the new refrigerator.  *See id*.  The refrigerator had a one-year limited warranty, which included repair services for all defects "in material or workmanship."[2]  ECF No. 47-6 at 3.

On May 11, 2009, pursuant to a Home Delivery and Shuttle Carrier Agreement (the "Agreement") with Sears Logistics Services ("SLS"),[3] Liberty delivered and installed the refrigerator.  *See* ECF Nos. 48-3 at 1, 48-4, 48-5.  To connect the icemaker to the water line, the refrigerator manual requires

---

[1] In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] The Stancills did not purchase an extended warranty.  ECF No. 47-8 at 4.

[3] SLS "provides logistics services and manages home delivery and shuttle service of general retail merchandise" for customers of Sears, Kmart Corporation, and other clients.  ECF No. 48-3 at 1.

the use of ¼ inch outside diameter copper tubing.[4]   ECF No. 47-6

at 6.   When Liberty installed the refrigerator, it connected the

icemaker to a plastic water line.[5]   ECF No. 47-3 at 1.

Under the Agreement, dated December 7, 2008, Liberty agreed

to perform its services "in a prompt, safe and workmanlike

manner, with due care, and in accordance with the standard of

performance exhibited by highly-skilled transportation

professionals operating on a nation-wide basis."   ECF No. 48-3

at 1.   It also agreed to "hook up all appliances according to

manufacturers' instructions."   *Id*.   In the event of any conflict

between the manufacturers' instructions and the provisions of

the Agreement or the instructions of SLS, SLS clients, or retail

customers, the manufacturers' instructions controlled.   *See id*.

Incorporated in the Agreement is Exhibit A, which outlines

the respective "Operations and Responsibilities" of SLS and

Liberty.   *See* ECF No. 48-3 at 12.   With respect to the

installation of refrigerators and freezers, Exhibit A instructs

Liberty to "re-connect icemaker to existing water line, provided

that water line meets manufacturer and local building

---

[4] Copper tubing should only be used, however, "in areas where the
household temperatures will remain above freezing."   ECF No. 47-
6 at 6.

[5] It is unclear whether Liberty replaced an existing copper water
line with the plastic line or whether the plastic water line was
in place already.   *See* ECF Nos. 47-3, 47-5 at 1-2, 48-13 at 4.

requirements.  Note:  icemaker connection may require connectors and additional tubing." *See id.* at 19.

When asked if Liberty installed the refrigerator with a plastic water line, a representative of Liberty testified that she "assum[ed Liberty] did, but [she was] not absolutely certain," because the installer did not note what line was used but "a plastic water line normally come[s] with that piece."[6] ECF No. 48-8 at 4.  She also confirmed that "generally a water line comes with a refrigerator with an ice maker."  *Id.* Finally, she confirmed that a "Best Practices Guide" developed by Sears for refrigerator installation, and used in training Liberty installers, directs that installers should "review the electrical, water, and gas hook-ups in the home as required." *Id.* at 5; *see also* ECF No. 48-9 at 14 (Guide).

In August 2009, the Stancills requested that Sears fix problems with the icemaker.  *See* ECF No. 48-10.  On August 14, 2009, a Sears technician wrapped insulation around the

---

[6] When asked a second time if a plastic water line comes with the Kenmore refrigerator the Stancills purchased, the Liberty representative stated that she "assum[ed] a water line *of some sort* would have come with it because they generally always do." ECF No. 48-8 at 4 (emphasis added).  She also noted that Liberty "generally suppl[ies] all plastic [water lines] because [they are] easier to work with.  It meets all the codes[, and is often] recommended by the manufacturer . . . if it runs through the door because it bends better than copper."  *Id.* at 6.

4

refrigerator's suction line to stop leaking,[7]  ECF Nos. 48-10 at

5, 48-11 at 6, and on August 28, 2009, a Sears technician

replaced a cracked drip pan, ECF No. 48-10 at 10.  Both repair

jobs required the technicians to move the refrigerator.  *See* ECF

Nos. 48-11 at 6, 8, 48-12 at 4.

Dan Smalt, a Sears employee who trains repair technicians,

testified that Sears technicians are required to inspect the

entire appliance when doing a service call on a refrigerator.

*See* ECF No. 48-14 at 5.  If the technician discovered that the

appliance had not been properly installed, he was responsible

for notifying Sears's installation department and fixing the

problem if he could.  *Id.*  Smalt also stated that neither of the

technicians who repaired the Stancills' refrigerator noted that

the refrigerator used a plastic water line, even though such

lines "are known to deteriorate over a period of time."  *Id.* at

7.  It was his "understanding that when a refrigerator is

installed, the customer is advised by the installation group

they should have a copper water line installed.  There's also

instructions in the . . . owner's manual that [customers] should

have a copper water line . . . .  [Sears] technicians also are

required to inform customers that have plastic water lines that

---

[7] The technician that performed this repair testified that "at
least 50 percent of the [water] lines out there, if not more,
are plastic," and seeing a plastic water line installed "would
[not] cause [him] any concern."  ECF No. 48-11 at 7.  However,
he would use copper water lines in his own home.  *Id.*

they should have a copper water line installed by a plumber."[8] *Id.* Finally, he stated that "there [are no] instances in which a person may prefer or may need a plastic water line over a copper water line," because "plastic water lines are known to deteriorate and . . . leak." *Id.* However, if the customer did not purchase a separate installation kit, in his "experience . . . the installation crew will hook up an appliance to an existing water line."[9] *Id.*

Between September 23 and October 3, 2010, while the Stancills were away on a two-week vacation in Maine, the water line to the icemaker failed. *See* ECF Nos. 47-7 at 4, 48-12 at 3. The resulting leak caused extensive damage to their kitchen. *See, e.g.,* ECF Nos. 47-9 at 2-3, 48-17. The Kenmore refrigerator's owner's manual states to "[s]hut off water supply to the icemaker" while on vacation, ECF No. 47-6 at 14, but the Stancills had not turned off the water supply before they left,[10] ECF No. 48-7 at 7. Brethren Mutual paid the Stancills'

_____

[8] Smalt "d[id] not know" whether either of the technicians informed the Stancills that they should be using a copper water line. ECF No. 48-14 at 7.

[9] The Stancills did not purchase a separate installation kit. ECF No. 49-4 at 6.

[10] The Stancills testified that they did not know that the owner's manual recommended that they turn off the water to the icemaker while on vacation. ECF Nos. 47-7 at 4, 49-3 at 12.

$84,654.42 insurance claim to repair the damage to their kitchen. ECF No. 48-17 at 1.

On February 22, 2012, Brethren filed a subrogation action[11] against Sears for negligence in the Circuit Court for Harford County, Maryland. ECF No. 2. On March 27, 2012, Sears removed to this Court. ECF No. 1. On March 29, 2012, Sears answered. ECF No. 8.

On July 30, 2012, Dominic Catanzaro, PE, issued a report about the damage to the Stancill residence and his examination and testing of the plastic water line.[12] ECF No. 47-3 at 1-2. The report stated that "[o]n close inspection" of the water line tubing, he "observed that it was cracked through the wall

---

[11] Subrogation is "the substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities." *Pulte Home Corp. v. Parex, Inc.*, 174 Md. App. 681, 742, 923 A.2d 971, 1005 (2007) *aff'd*, 403 Md. 367, 942 A.2d 722 (2008) (internal quotations and punctuation omitted). "An insurer which has paid for a loss in whole or part becomes subrogated to the rights of the insured as holder of the claim and stands in the shoes of such subrogor." *Potomac Elec. Power Co. v. Babcock & Wilcox Co.*, 54 F.R.D. 486, 489 (D. Md. 1972); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 318, 999 A.2d 1066, 1069 (2010).

[12] Catanzaro's report and testimony stated that Mrs. Stancill had told him that the icemaker on the original refrigerator was connected with a copper line, which was replaced with a plastic water line when the new refrigerator was installed. ECF Nos. 47-3 at 1, 48-7 at 5. Mrs. Stancill later testified that she did not remember what material was used in the old or new lines or whether the line had been replaced. ECF No. 49-3 at 10-11.

thickness permitting for the seepage of water." *Id*.   The

cracking was "consistent with damage caused by crushing."   *Id*.

Because of the location of the cracked portion of the tube,

Catanzaro stated that the crushing "could not have occurred in

the Stancill house . . . as it simply was not in a position to

be crushed or squeezed between any two surfaces."   *Id*.

The report also stated that "[t]he tubing's yellowed color

and soiled exterior suggested that it was not brand new tubing

first used at the time the Stancill[s'] refrigerator was

installed but rather, this tubing was salvaged from another

installation and used in the Stancill[s'] home."[13]   *Id*. at 2.

The report noted that using "previously used construction

materials, particularly plastic water pipe is not accepted

practice" and that "the Kenmore Elite Use and Care Guide

specifically calls for ¼ inch O.D. copper tubing, not plastic

tubing."[14]   *Id*. at 2.

The report concluded that the water damage was caused by

seepage from the cracked plastic water line tube, and that

_____

[13] At his deposition, Catanzaro opined that, based on his
experience, the condition of the water line indicated that "it
couldn't be 17 months old.  It had to have been older than
that." ECF No. 47-4 at 3.

[14] At his deposition, Catanzaro noted that the "minimum standard"
would be use of a plastic line, but in his opinion "copper would
have to be used" because the manufacturer directed the use of
copper. ECF No. 47-4 at 4.

"using this plastic tubing is not in accordance with Kenmore's installation instructions." *Id.* at 3.

Catanzaro later testified that, in his opinion, there was sufficient slack in the water line, so that if the refrigerator was pulled out for repair or cleaning,[15] no stress or kinks would be put on the water line. ECF No. 48-7 at 4. He also stated that, based on the way the water line was affixed to the back of the refrigerator, there was no way for the line to be crushed by the bottom or back of the refrigerator if it was moved. *Id.* at 6. He also noted that, in the area where the pipe was cracked and leaking, it was "impossible to [him] that it could have been crushed or pinched or impinged upon or damaged in any way . . . once it's in service." *Id.* Finally, Catanzaro confirmed, however, that if the Stancills had turned off the water to the icemaker as instructed in the refrigerator's manual, the damage to the kitchen would not have occurred. *Id.* at 4.

On September 25, 2012, the Court granted Sears's consent motion for leave to file a third-party complaint against Liberty, based on Catanzaro's findings, seeking contractual indemnification and common law indemnification and

---

[15] There is no indication in the record that the Stancills ever cleaned behind, or moved, the Kenmore refrigerator during the 17 months they owned it before the leak occurred. ECF Nos. 47-7 at 3, 48-12 at 4, 49-3 at 8.

contribution.[16]   ECF No. 14.   On October 22, 2012, Brethren moved

to amend the complaint to assert a negligence claim against

Liberty, based on Catanzaro's report.   ECF No. 25.   On April 30,

2013, the Court granted Brethren's motion to amend.   ECF No. 30.

On October 30, 2013, the parties deposed the Stancills.

ECF No. 45 at 6.   During her deposition, Brethren's counsel

asked Mrs. Stancill if, while she was on vacation, she had

"worried about anything bad happening to [her] home."   *Id.*; ECF

No. 45-10 at 1.   Mrs. Stancill responded that she was not

worried, because the Stancills "had a man who was working for

[them] come twice a day to [feed and] let the dog in and out of

the house . . . .   He kind of kept an eye on what was going on."

*Id.*   The defendants' counsel then questioned Mrs. Stancill about

the man, whom the defendants had not known about.[17]   ECF Nos. 46-

1 at 4.   Mrs. Stancill told the defendants' counsel that his

name was David Jones,[18] and that he was responsible for

_____

[16] On October 30, 2013, Sears and Liberty stipulated to the
dismissal of the third-party complaint without prejudice.   ECF
No. 41.

[17] Brethren states that it also did not learn about the man until
right before Mrs. Stancill's deposition, and thus disclosed his
existence to the defendants "within a few hours of . . .
learning of it."   ECF No. 46 at 2-3.

[18] The defendants' papers at times refer to "David Jones," "David
Miller," and "David Smith."   ECF Nos. 45 at 1, 11, 45-11 at 1.
Because Mrs. Stancill's testimony indicates that the person's
name is "David Jones," the latter two references are apparently
errors.   The Court will only authorize further discovery, *see*

maintaining their lawn when the Stancills were home.  *See id*. at 4-5.  Every day while they were on vacation, Jones was also responsible for entering the kitchen through the mud room to get the dog from his bed and then let the dog outside through the mud room door.  *See id*.  The dog bed was on the other side of the kitchen from the refrigerator.  *See id*. at 5.  Jones was also responsible for feeding the dog; the dog's food and bowls were in the mud room.  *See id*.  Mrs. Stancill said that Jones was also responsible for checking to see if any "major problems" had occurred, like "break-ins, fire, earthquake," and that he did not notice any problems with the refrigerator or in the kitchen.[19]  *Id*. at 4.  Mrs. Stancill confirmed that Jones would not have had "any reason . . . to go to the other side of the [kitchen] island where the refrigerator was."  *Id*. at 5.

On November 8, 2013, Brethren supplemented its interrogatory responses to add David Jones to the list of persons "having personal knowledge and/or discoverable knowledge of the facts alleged in [the] Complaint."  ECF No. 45-14 at 1-2.  On November 13, 2013, discovery closed.  ECF No. 46 at 3.

On November 26, 2013, the defendants moved for Rule 37 and Rule 11 sanctions against Brethen or, alternatively, to reopen

---

*infra* Section II.A.3, as it pertains to David Jones, the man referenced in Mrs. Stancill's deposition.

[19] The mud room was not affected by the refrigerator leak.  ECF No. 46-1 at 5.

discovery to depose Jones and for leave to file a third-party complaint against Jones.  ECF No. 45.  On December 11, 2013, Brethren opposed the motion.  ECF No. 46.  The same day, the defendants moved for summary judgment.  ECF No. 47.  On December 30, 2013, Brethren opposed the motion.  ECF No. 48.  On February 6, 2014, the defendants replied.  ECF No. 49.

II.  Analysis

 A. Motion for Sanctions or to Reopen Discovery

  The defendants move for sanctions under Federal Rules of Civil Procedure 11 and 37, asserting that Brethren "has acted in bad faith to frustrate the Defendants' discovery efforts and to withhold evidence from them that would be useful in defending this case."  ECF No. 45 at 10.  Specifically, the defendants contend that Brethren failed to disclose Jones's existence and potential involvement in this case, even though Brethren knew about Jones "since the time of the occurrence in 2010."  *See id*. at 9-10.  As an alternative to sanctions, the defendants request to reopen discovery to depose Jones and other witnesses about Jones's involvement and leave to file a third-party complaint against Jones.  *See id*. at 10-11.  Brethren argues that sanctions are unwarranted, because it disclosed Jones's identity to the defendants within hours of learning about him, and because the defendants failed to comply with procedural requirements for imposing sanctions.  *See* ECF No. 46 at 2-4.

1. Rule 37 Sanctions

Rule 37(b)(1) provides for sanctions when "a party fails to provide information or identify a witness as required by Rule 26(a) or (e)." However, before filing a motion under Rule 37, the parties are required to meet and confer to try to resolve the discovery dispute without court action. *See* Local Rule 104.7 (D. Md. 2011) ("Counsel shall confer with one another concerning a discovery dispute and make sincere attempts to resolve the differences between them."); *Frontier-Kemper Constructors, Inc. v. Elk Run Coal Co., Inc.*, 246 F.R.D. 522, 525-26 (S.D.W. Va. 2007). Rule 37(a) and Local Rule 104.7 require the moving party to certify that it conferred, or attempted to confer, with the opposing party before filing the motion. The defendants have not filed the required certification or described any attempts to confer with Brethren, and Brethren states that no such attempts were made before the defendants filed the motion. *See* ECF No. 46 at 3-5. Accordingly, the Court will deny the motion for Rule 37 sanctions without prejudice.[20]

---

[20] *See* Local Rule 104.7 ("The Court will not consider any discovery motion unless the moving party has filed a [meet and confer] certificate . . . ."); *Mezu v. Morgan State Univ.*, 269 F.R.D. 565, 585 (D. Md. 2010) ("Because Defense counsel has not complied with Rule 37(a)(1) or Local Rule 104.7, the Court will not consider Defendant's motion to compel."); *Tustin v. Motorists Mut. Ins. Co.*, 5:08-CV-111, 2009 WL 3335060, at *13 (N.D.W. Va. Oct. 14, 2009) ("The failure to follow [the meet and

2. Rule 11 Sanctions

Under Rule 11(b), an attorney or unrepresented party certifies to the court that to the best of his "knowledge, information, and belief" formed after a reasonable inquiry: (1) the action is not being presented for an improper purpose, (2) the legal contentions are warranted, (3) the facts alleged have or will have evidentiary support, and (4) denials of facts are based on evidence or lack of knowledge. "[A]n improper purpose may be inferred from a claim's lack of factual or legal foundation or other factors such as the timing of filing of the complaint." *Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 313 (E.D. Va. 2004) (*citing In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990)).  Rule 11(c) allows attorneys and parties to be sanctioned for violations of subsection (b).  Under Rule 11(c)(2), motions for sanctions "must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)."

The defendants have not specified which conduct of Brethren allegedly violates Rule 11, other than Brethren's alleged failure to timely disclose the existence of Jones during

---

confer] requirement is grounds for the court to deny the motion to compel."); *but see Frontier-Kemper*, 246 F.R.D. at 526 (remedy for failing to file certificate is denial of request for expenses incurred in making the motion).

discovery.[21]   Rule 11 does not apply to discovery motions under

Rules 26 through 37.   *See* Rule 11(d).   The defendants also

combined their motion for Rule 11 sanctions with their motion

for Rule 37 sanctions, their request to reopen discovery, and

their motion for leave to file a third-party complaint, in

violation of Rule 11(c)(2).   Because the defendants have failed

to comply with these procedural requirements, the Court will

deny the defendants' Rule 11 motion without prejudice.   *See*

*Allie v. Whole Foods Mkt. Grp., Inc.*, 746 F. Supp. 2d 773, 778

(E.D. Va. 2010) (denying motion for sanctions when "Plaintiff

failed to file a separate motion specifically explaining how

Defendant's conduct violates Rule 11") (*citing Brickwood*

*Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 389 (4th

Cir. 2004) ("It is clear from the language of [Rule 11(c)(1)(A)]

that it imposes mandatory obligations upon the party seeking

sanctions, so that failure to comply with the procedural

---

[21] In addition to Brethren's alleged failure to disclose Jones's
identity, the defendants' motion implies that various other
actions by Brethren are potentially sanctionable misconduct.
For example, the motion highlights the "interesting[]" timing of
the completion of Catanzaro's expert report and criticizes the
merits of Brethren's negligence claim. *See* ECF No. 45 at 9.
The motion does not, however, argue or show how any of this
conduct violates Rule 11.   It is not the job of the Court to
ferret out potential violations of Rule 11 from hints of
misconduct. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th
Cir. 1991) ("Judges are not like pigs, hunting for truffles
buried in briefs.").

requirements precludes the imposition of the requested
sanctions.")).

### 3. Discovery and Third-Party Complaint

The defendants also move to reopen discovery to allow them
to depose Jones and "all relevant witnesses, including expert
witnesses, regarding how the actions or inactions of [Jones]
[a]ffect their opinions."  ECF No. 45 at 11.  Because the
defendants learned of Jones's existence only a few days before
discovery closed, the Court will reopen discovery for the
limited purpose of deposing Jones and ascertaining what, if any,
relevance his actions have.  The parties will propose a joint
scheduling order for this limited discovery.

The defendants also request leave to file a third-party
complaint against Jones for indemnification and contribution,
which Brethren opposes.  *See* ECF Nos. 45 at 10, 46 at 5.  Under
Federal Rule of Civil Procedure 14(a), "[a] defending party may,
as third-party plaintiff, serve a summons and complaint on a
nonparty who is or may be liable to it for all or part of the
claim against it."  The third-party plaintiff must obtain the
Court's permission to file the third-party complaint "more than
14 days after serving its original answer."  Rule 14(a).  Rule
14 is "liberally construed" to permit impleader in the interest
of judicial economy, but joinder of third-parties is not
automatic.  *Baltimore & O.R. Co. v. Saunders,* 159 F.2d 481, 484

16

(4th Cir. 1947); *M.O.C.H.A. Society, Inc. v. City of Buffalo*, 272 F. Supp. 2d 217, 220 (W.D.N.Y. 2003).  The Court has broad discretion to deny or dismiss third-party complaints.  *See Noland Co. v. Graver Tank & Mfg. Co.*, 301 F.2d 43, 50 (4th Cir. 1962).  Impleader should be denied if joining the third-party would unduly complicate the original suit, introduce unrelated issues, or if the third-party complaint is obviously unmeritorious.  *Commodity Futures Trading Comm'n v. Calvary Currencies, LLC*, 2005 WL 263902, at *2 (D. Md. Feb. 2, 2005).

As the defendants have not attached a copy of the proposed third-party complaint to the motion, the Court cannot determine whether the defendants should be granted leave to file a third-party complaint against Jones.[22]  The Court will deny without prejudice the defendants' motion for leave to file a third-party complaint.[23]

---

[22] *See* Charles Alan Wright, Arthur R. Miller, *et al.*, *Practice in Third-Party Actions—Pleading*, 6 Fed. Prac. & Proc. Civ. § 1453 (3d ed.) ("Sound practice indicates that a motion for leave to implead should be accompanied by a copy of the summons and complaint that defendant proposes to serve on the third party."); *Liberty Folder v. Curtiss Anthony Corp.*, 90 F.R.D. 80, 84 (S.D. Ohio 1981).

[23] The parties will also propose a briefing schedule in the scheduling order for the defendants' motion for a third-party complaint, Brethren's opposition to that motion, and the defendants' reply brief.

B. Legal Standard for Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[24]  In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

---

[24] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

1. Negligence

Under Maryland law,[25] "[n]egligence is 'any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm.'" *Mayor & City Council of Baltimore v. Hart*, 395 Md. 394, 410, 910 A.2d 463, 472 (2006) (*quoting Holler v. Lowery*, 175 Md. 149, 157, 200 A. 353, 357 (1938)).  Reasonable or ordinary care is "that caution, attention or skill a reasonable person would use under similar circumstances." *Adams v. NVR Homes, Inc.*, 135 F. Supp. 2d 675, 702 (D. Md. 2001) (*citing* MPJI § 19:1).  To establish negligence, a plaintiff must prove that: (1) the defendant was under a duty to protect the plaintiff from injury; (2) the defendant breached that duty; (3) the plaintiff suffered actual

---

[25] When sitting in diversity, a federal court follows the choice-of-law rules of the forum state.  *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941).  Maryland applies the rule of *lex loci delicti* to determine the law to apply in tort cases.  *See, e.g., Philip Morris Inc. v. Angeletti*, 358 Md. 689, 750, 752 A.2d 200, 233 n.28 (2000).  Under that rule, the court applies the law of the state "where the injury—the last event required to constitute the tort-occurred."  *Lab. Corp. of America v. Hood*, 395 Md. 608, 615, 911 A.2d 841, 845 (2006).  All the events at issue in this suit occurred at the Stancills' home in Maryland.  *See, e.g.*, ECF No. 48-2.  Accordingly, Maryland law governs Brethren's negligence claim.

injury or loss;[26] and (4) the loss or injury proximately resulted from the defendant's breach of the duty.  *Valentine v. On Target, Inc.*, 353 Md. 544, 549, 727 A.2d 947 (1999).

"Generally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder; but, the existence of a legal duty is a question of law to be decided by the court."  *Id.*  "Maryland has gone about as far as any state in holding that meager evidence of negligence is sufficient to carry a case to the jury."  *Moodie v. Santoni*, 292 Md. 582, 587, 441 A.2d 323, 326 (1982) (*citing Fowler v. Smith*, 240 Md. 240, 213 A.2d 549 (1965)).

### a. Duty

In its amended complaint, Brethren alleges that the defendants "had a duty to use reasonable care and adhere to the manufacturer's instructions when originally installing and/or repairing the Stancill[s'] refrigerator."[27]  ECF No. 32 at 4-5.

---

[26] That Brethren and the Stancills suffered damages of $84,654.42 is undisputed.  ECF No. 48-17 at 1 (insurance company statement of loss).

[27] The defendants argue that Brethren can no longer assert a negligence claim on the basis of Sears's subsequent repairs to the refrigerator, because it amended its complaint "to indicate that the subject refrigerator was negligently installed."  ECF No. 47 at 13.  However, Federal Rule of Civil Procedure 8(d) permits a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically," even if they are inconsistent.

The defendants contend that Brethren has failed to produce evidence that they had a duty "to remove the previously existing ice maker line" or to install copper tubing "if the customer . . . did not purchase an installation kit."  ECF No. 47 at 13. Brethren argues that there is sufficient evidence to create a triable issue of fact on whether the defendants had a duty "to exercise ordinary and reasonable care in installing, maintaining, or repairing the refrigerator."  *See* ECF No. 48 at 8-12.

In the absence of a duty of care, there can be no liability in negligence.  *Walpert, Smullian & Blumenthal, P.A. v. Katz, et al.*, 361 Md. 645, 655, 762 A.2d 582 (2000).  To determine whether a duty of care exists, the court considers "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986).  "Such a relationship may be established in a number of ways: (1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party."  *Bobo v. State*, 346 Md. 706, 715, 697 A.2d 1371, 1376 (1997) (internal citations omitted).

The evidence shows that the Stancills paid Sears to install and deliver their new refrigerator, and Sears sub-contracted

21

that work to Liberty.  *See* ECF Nos. 48-2, 48-3, 48-4, 48-5.  The evidence also shows that the refrigerator had a one-year limited warranty, which included repair services, and that Sears technicians repaired the refrigerator twice in the year after it was installed.  ECF Nos. 47-6 at 3, 48-10 at 5, 10, 48-11 at 6. By undertaking to repair and install the refrigerator, in exchange for the Stancills' purchase of the refrigerator, warranty, and installation service, Sears and its sub-contractor Liberty had a duty to exercise reasonable care in installing and repairing the refrigerator.[28]

---

[28] *See, e.g.*, *Valerio v. Penske Truck Leasing Co., L.P., Inc.*, CIV.A.CCB06-2436, 2009 WL 1609045, at *6 (D. Md. June 5, 2009) ("Given that Penske entered into a contract with Automatic Rolls to service the trailer in question, it was under a duty to exercise reasonable care in maintaining and repairing it." (internal citation omitted) (*citing* Restatement (Second) of Torts § 323 (1965) ("One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.")); *Klein v. Dougherty*, 200 Md. 22, 29, 87 A.2d 821, 825 (1952) (hired installers had duty to exercise reasonable care in performing installation work).

b. Breach

It is undisputed that the icemaker used a plastic water line that leaked.[29] The manufacturer recommends that copper, not plastic, water lines should be used for the icemaker, except in areas of the home where the temperature might drop below freezing. ECF No. 47-6 at 6. The Agreement between SLS and Liberty requires Liberty to follow the manufacturer's recommendations in installing refrigerators. ECF No. 48-3 at 1. Catanzaro also testified that refrigerator installation should follow the manufacturer's recommendations. ECF No. 47-4 at 4. Smalt testified that plastic water lines are not recommended because they deteriorate over time. ECF No. 48-14 at 7. Finally, when performing repairs, Sears technicians are instructed to check whether the refrigerator has been properly installed, notify Sears of any problems with the installation, and inform customers who are using plastic water lines that they should use copper instead. *See* ECF No. 48-14 at 5, 7. Thus, there is at least "meager" evidence in the record from which a reasonable jury could find that the defendants failed to act

---

[29] However, there is conflicting evidence about whether Liberty replaced the old water line when installing the refrigerator. *See supra* note 5.

with reasonable care in repairing or installing the
refrigerator.[30]

        c. Causation

    The defendants argue that there is no evidence of
causation, because there is no evidence "regarding the condition
of the subject waterline at the time it was installed [and]
Plaintiff is unable to provide any proof that the Stancills
chose not to purchase a new installation kit, and chose to
utilize the existing waterline."  ECF No. 47 at 16.  They also
point out that "there has been no evidence that if the waterline
had been copper, the subject occurrence would not have taken
place."  *Id.*

    To recover, the defendant's negligence must be a proximate
cause of the plaintiff's alleged harm.  *See Pittway Corp. v.
Collins,* 409 Md. 218, 243, 973 A.2d 771 (2009).  "To be a
proximate cause for an injury, the negligence must be (1) a

---

[30] The defendants have submitted evidence that might ultimately
contradict or undermine Brethren's evidence of negligence, such
as Smalt's testimony that Liberty acted in accordance with
standard practice by connecting the new refrigerator's icemaker
to the existing water line.  ECF No. 48-14 at 7.  However, in
resolving a motion for summary judgment, the Court's function is
to determine whether a genuine dispute of material fact exists,
not to weigh the evidence.  *Anderson,* 477 U.S. at 249; *see also
Fowler,* 240 Md. at 246 ("[B]efore it can be determined as a
matter of law that one has not been guilty of negligence, the
truth of all the credible evidence tending to sustain the claim
of negligence must be assumed and all favorable inferences of
fact fairly deducible therefrom tending to establish negligence
drawn.").

cause in fact, and (2) a legally cognizable cause." *Id.*

(*quoting Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 156–57,

642 A.2d 219 (1994) (internal quotation marks omitted)).  When

only one negligent act is at issue, causation-in-fact exists if

the injury would not have occurred "but for" the defendant's

negligent act.  *Wankel v. A & B Contractors, Inc.*, 127 Md. App.

128, 158–59, 732 A.2d 333, 349 (1999).  If two or more

independent acts result in the injury, causation-in-fact exists

when "it is 'more likely than not' that the defendant's conduct

was a substantial factor in producing the plaintiff's injuries."

*Id.*

In determining legal causation, the Court must consider

"whether the actual harm to a litigant falls within a general

field of danger that the actor should have anticipated or

expected."  *Pittway*, 409 Md. at 245, 973 A.2d 771.  The question

of legal causation is "grounded in foreseeability."  *Troxel v.

Iguana Cantina, LLC*, 201 Md. App. 476, 505 (Md. Ct. Spec. App.

2011).  The existence of proximate cause is typically a question

reserved for the jury, unless "reasoning minds cannot differ."

*Pittway*, 409 Md. at 253, 973 A.2d 771 (*quoting Segerman v.

Jonas*, 256 Md. 109, 135, 259 A.2d 794 (1969)); *Chang-Williams v.

United States*, No. DKC-10-0783, 2013 WL 4454597, at *18 (D. Md.

Aug. 15, 2013).

The defendants challenge only whether any alleged negligence was the cause-in-fact of the damage to the Stancills' home.  As discussed above, there is evidence that the defendants may have acted negligently in failing to install the refrigerator using a copper water line or to remedy the installation during the subsequent repairs.  Given the manufacturer's recommendation to use copper water lines, and Sears's technician's testimony that plastic water lines are disfavored because they tend to deteriorate over time, there is sufficient evidence for a jury to infer that, if a copper water line had been used, there would have been no leak.[31]  *See* ECF Nos. 47-6 at 6, 48-14 at 7.

The defendants argue that *Peterson v. Underwood*, 258 Md. 9, 17, 264 A.2d 851, 855 (1970) dictates a contrary result.  *See* ECF No. 47 at 16-18.  In *Peterson*, a concrete wall collapsed four and a half years after it was built, killing a child.  258 Md. at 16, 264 A.2d at 854.  The plaintiff's expert testified that the wall had not been built according to code, but did not testify about how the wall collapsed.  *Id.* at 18, 264 A.2d at 856.  The *Peterson* court held that--without any direct evidence

---

[31] Although the defendants suggest that they could not have been negligent, because the Stancills did not purchase an installation kit which presumably would have included a copper water line, the Liberty representative testified that refrigerators usually came with a water line for the icemaker. *See* ECF Nos. 48-4 at 4, 48-13 at 5.

about how the wall collapsed--the jury could not permissibly infer that the wall had collapsed because of negligent construction that occurred more than four years before the collapse. *See id.* at 18-19, 264 A.2d at 856.  Here, Brethren's expert Catanzaro testified that the leaks occurred because the plastic water line was old and defective, that the cracks in the water line were not caused by moving the refrigerator after it was installed, and that the defendants should have installed a copper water line in accordance with the manufacturer's recommendation.  ECF No. 47-3 at 1-3.  Accordingly, Catanzaro's testimony provides sufficient evidence for the jury to conclude that--if the defendants breached their duty to the Stancills by failing to install a copper water line--the use of the plastic water line was the cause-in-fact of the damage that occurred.[32]

### 2. Contributory Negligence

The defendants assert the defense of contributory negligence, contending that, if not for the Stancills' negligent acts, the damage to their kitchen would not have occurred.[33]  *See*

---

[32] Even under the substantial factor test, there is sufficient evidence for the jury to conclude that the defendant's negligence in failing to install a copper water line "more likely than not" was sufficient--standing alone--to cause the injury, particularly given Smalt's testimony that plastic water lines tend to deteriorate over time and leak.  *Wankel*, 127 Md. App. at 158-59.

[33] Brethren contends that the defense of contributory negligence is not available to the defendants as a matter of law, because

ECF No. 47 at 18-19.  Under Maryland law, "contributory
negligence on the part of a plaintiff completely bars recovery
against a negligent defendant."  *Wooldridge v. Price,* 184 Md.
App. 451, 966 A.2d 955, 961 (Md. Ct. Spec. App. 2009).
"Contributory negligence is that degree of reasonable or
ordinary care that a plaintiff fails to undertake in the face of
an appreciable risk which cooperates with the defendant's
negligence in bringing about the plaintiff's harm."  *Bd. of
Cnty. Comm'rs of Garrett Cnty., Md. v. Bell Atl.-Maryland, Inc.,*
346 Md. 160, 180, 695 A.2d 171, 181 (1997).  The standard of
care used to measure contributory negligence "is that of an
ordinarily prudent person under the same or similar
circumstances, not that of a very cautious person."  *Menish v.
Polinger Co.,* 277 Md. 553, 559, 356 A.2d 233, 236 (1976).
Contributory negligence is an affirmative defense that a
defendant must prove by a preponderance of the evidence.  *Id.*

It is undisputed that the owner's manual directed owners to
turn off the water to the refrigerator while on vacation and
that, if the Stancills had turned off the water, the damage to
their kitchen during their vacation would not have occurred.

the defendants' negligence occurred "more than one year prior to
the Stancills' alleged negligence."  ECF No. 48 at 20.  However,
Brethren did not move for summary judgment on this defense.
Brethren may renew its arguments for judgment as a matter of law
on the defense of contributory negligence by motion at trial.
*See* Fed. R. Civ. Proc. 7(b)(1) ("A request for a court order
must be made by motion.").

ECF Nos. 47-6 at 13, 48-7 at 4.  However, a jury might reasonably conclude that the Stancills did not fail to exercise ordinary care in leaving on the water to their refrigerator while on vacation for two weeks.[34]  *See Faith v. Keefer*, 127 Md. App. 706, 747, 736 A.2d 422, 444 (1999) ("[I]n measuring contributory negligence . . . even if the act done turns out to be an error of judgment, this alone does not make the act negligent if an ordinarily prudent person may have made the same error.") (internal quotations omitted).  Summary judgment is not warranted on this basis.  *See Moodie*, 292 Md. at 589-90, 441 A.2d at 326-27 ("The absence or presence of contributory negligence is generally a question for the jury," unless "the minds of reasonable persons cannot differ . . . .").

---

[34] The defendants suggest that, if they were negligent in using a plastic water line to connect the refrigerator icemaker against manufacturer recommendations, than the Stancills were necessarily negligent in failing to turn off the water while on vacation against the owner's manual's recommendations.  ECF No. 47 at 18.  However, negligence is a failure to exercise the degree of "caution, attention or skill a reasonable person would use *under similar circumstances*." *Adams*, 135 F. Supp. at 702 (emphasis added).  A jury might reasonably conclude that a reasonable person who was regularly hired to install, repair, and sell refrigerators in the course of his business would follow the manufacturer's recommendations in the exercise of ordinary care, while simultaneously concluding that a reasonable refrigerator owner who goes on vacation for two weeks would not be negligent in failing to turn off the water to his refrigerator in accordance with the manual's instructions.

3. Assumption of the Risk

The defendants contend that Brethren is also barred from recovery, because the Stancills assumed the risk of a leak when they "chose to ignore the recommendations of the Owners Manual and did not turn off the water," or because they were responsible for "approv[ing] the work of the installer." *See* ECF No. 47 at 20.   Brethren contends that "[t]here is no evidence . . . that the Stancills had knowledge of the risk that the waterline would leak or [knew] the risk was heightened due to the presence of a deteriorated plastic waterline in their kitchen."   ECF No. 48 at 21.   Brethren also argues that the defendants "cannot impose a duty on the Stancills to 'inspect' their work in installing and repairing the refrigerator," because the defendants held themselves out to be experts in this work, and the Stancills relied on that expertise.   *Id.* at 22.

Under Maryland law, if the plaintiff has assumed a risk, he is barred from recovering for the defendants' negligence.   *See Meyers v. Lamer*, 743 F.3d 908, 912 (4th Cir. 2014) (*citing Warsham v. James Muscatello, Inc.*, 189 Md. App. 620, 640, 985 A.2d 156, 168 (2009)).   The defense rests "on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk."   *Crews v. Hollenbach*, 358 Md. 627, 640, 751 A.2d 481, 488 (2000); *Rogers*

v. *Frush*, 257 Md. 233, 243, 262 A.2d 549, 554 (1970).  To prove

secondary assumption of the risk,[35] the defendant must establish

that: "(1) the plaintiff had knowledge of the risk of danger;

(2) the plaintiff appreciated that risk; and (3) the plaintiff

voluntarily encountered the risk of danger."  *Id.* at 628, 730

A.2d at 753 (*citing ADM Partnership v. Martin,* 348 Md. 84, 90–

91, 702 A.2d 730 (1997)).  Assumption of risk depends on the

plaintiff's subjective knowledge--"[b]ecause the focus is on

what the plaintiff actually knew, understood and appreciated the

issue is ordinarily left to the jury to resolve," unless the

risk is a foreseeable consequence of an activity or a "patent or

---

[35] The defendants argue that the defense of primary assumption of
the risk also applies to the Stancills' conduct.  ECF No. 47 at
20.   This defense "applies when the defendant lacks any duty to
protect the plaintiff from the particular risk, and thus the
defendant cannot have breached a duty of care owed to the
plaintiff."  *Crews v. Hollenbach*, 126 Md. App. 609, 626-27, 730
A.2d 742, 752 (1999) *aff'd,* 358 Md. 627, 751 A.2d 481 (2000).
The "no duty" rationale for primary assumption of the risk
generally arises from a "judicially-crafted public policy
designed to limit the duty of care that the public owes to
certain classes of plaintiffs."  *Kelly v. McCarrick*, 155 Md.
App. 82, 95, 841 A.2d 869, 876 (2004) (internal quotations and
punctuation omitted).  For example, under the Fireman's Rule,
firefighters and police officers cannot recover for "damages
inflicted by a negligently created risk that required their
presence on the scene in their professional capacity."  *Crews*,
358 Md. at 642, 751 A.2d at 489.  The defendants have not
offered--and the Court has not found--any support for the
existence of a "judicially-crafted" public policy in Maryland
that those who install and repair refrigerator appliances do not
owe a duty of care, or owe a diminished duty of care, to their
customers.

obvious danger." *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 115, 117, 31 A.3d 212, 226-27 (2011).

There is no evidence that the Stancills knew that the plastic water line posed a risk, and it is unclear if either of the Stancills knew that their refrigerator used a plastic water line. *See supra* note 5.  Also, the Stancills testified that they did not know that the owner's manual recommended that they turn off the water to the refrigerator while they were on vacation.  ECF Nos. 47-7 at 4, 49-3 at 12.  Accordingly, summary judgment on the basis of assumption of risk is not warranted. *See Poole*, 423 Md. at 121, 31 A.3d at 230 ("[F]or a plaintiff to have knowledge of the risk, as a matter of law, there must be undisputed evidence that he or she had actual knowledge of the risk prior to its encounter.").

Because there is sufficient evidence to create a genuine dispute of material fact on the issue of the defendants' negligence, and the Court cannot rule, as a matter of law, that the Stancills were contributorily negligent or assumed a risk, summary judgment will be denied.

III. Conclusion

For the reasons stated above, discovery will be reopened, the motion for sanctions and to file a third-party complaint will be denied without prejudice, and summary judgment will be denied.


_7/10/14_
Date

_____
William D. Quarles, Jr.
United States District Judge